# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MCKINNEY/PEARL   RESTAURANT §
PARTNERS, L.P., §
§
   Plaintiff, §
§
v. § CIVIL ACTION NO. 3:14-CV-2498-B
§
METROPOLITAN   LIFE   INSURANCE §
COMPANY, CBRE, INC., f/k/a CB §
RICHARD ELLIS, INC., and MCPP 2100 §
MCKINNEY, LLC, §
§
   Defendants. §

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Metropolitan Life Insurance Company (MetLife), CBRE, Inc., f/k/a CB Richard Ellis, Inc. (CBRE), and MCPP 2100 McKinney, LLC's (MCPP) Motions for Summary Judgment. Docs. 194, 195, and 196. For the reasons explained below, MetLife's and MCPP's motions are **GRANTED in part** and **DENIED in part**, and CBRE's motion is **DENIED**.

Also before the Court are (1) Defendants' motions to strike or exclude the testimony of fourteen experts designated by Plaintiff[1] and (2) Plaintiff's motions to exclude or limit the testimony

---

[1] Defendants' Motion to Exclude Expert Testimony of William Harris (doc. 215); Defendants' Motion to Exclude Expert Testimony of EJ Janik (doc. 217); Defendants' Motion to Exclude Expert Testimony of John Walsh (doc. 223); Defendants' Motion to Exclude Expert Testimony of David Cannon and David Fincannon (doc. 226); Defendants' Motion to Strike Designation and Exclude Testimony of Non-retained Experts Kim Forsythe, Debbie Barber, Laura Dalager, and Jamie Spurgeon (doc. 228); Defendants' Motion to Exclude Expert Testimony of Chris Tripoli (doc. 231); Defendants' Motion to Exclude Expert Testimony of Edwin Litolff (doc. 233); and Defendants' Motion to Exclude Expert Testimony of John Bryant, Michael Lee, and Dale Sellers (doc. 256).

of ten experts designated by Defendants.[2] As explained in Part III.A below, all motions to strike, exclude, or limit expert testimony filed by either side are **DENIED without prejudice** at this time.

# I.

# BACKGROUND

A.    *Factual History*[3]

This landlord–tenant dispute arises from the alleged breach of a lease agreement by the property owner. In short, Plaintiff contends MetLife, the property owner, failed to maintain and repair the structural system of the leased premises as required under the lease and—in conspiracy with CBRE, the property manager—made various misrepresentations regarding the cause of and efforts to remedy the structural issues.

Plaintiff McKinney/Pearl Restaurant Partners, L.P., d/b/a Sambuca (Plaintiff or Sambuca), operates a restaurant in the Uptown neighborhood of Dallas, Texas. Doc. 120, Pl.'s 4th Am. Compl. ¶ 8. Sambuca began as an upscale jazz restaurant in the Deep Ellum neighborhood of Dallas in 1991. *Id.* On October 6, 2003, Sambuca entered into a commercial lease agreement (Lease Agreement or Lease) with non-party 2100 Partners, L.P. for approximately 9,000 square feet of space to move its restaurant to Uptown. *Id.* The Lease was for an initial ten-year term with two five-year renewal

---

[2]Plaintiff's Motion to Exclude Expert Testimony of Robert Sprague (doc. 235); Plaintiff's Motion to Exclude or Limit Expert Testimony of Charles Dannis (doc. 237); Plaintiff's Motion to Exclude Expert Testimony of Matthew Huntsman (doc. 239); Plaintiff's Motion to Limit Expert Testimony of Gary Durham (doc. 241); Plaintiff's Motion to Exclude Expert Testimony of Michael Cox (doc. 243); Plaintiff's Motion to Limit Expert Testimony of Donald Illingworth (doc. 247); Plaintiff's Motion to Exclude or Limit Expert Testimony of Dennis McKinzie (doc. 249); Plaintiff's Motion to Exclude or Limit Expert Testimony of Lynn Motheral (doc. 251); Plaintiff's Motion to Exclude Expert Testimony of M. Bradley Gaskins (doc. 253); Plaintiff's Motion to Exclude or Limit Expert Testimony of Philip King (doc. 255).

[3]The Court draws its factual history from the pleadings and the summary judgment record. Any contested fact is identified as the contention of a particular party.

options. *Id.* The Lease provided, among other things, that the landlord "shall keep and maintain in good condition and repair: (A) the roof and structural system of the Restaurant Building . . . ." Defs.' App. 1855, Lease Agreement § 7(b)(ii).[4]

After signing the Lease, Plaintiff worked with 2100 Partners, L.P. to commence "the necessary work to finish-out and ready the building." Doc. 280, Pl.'s Consolidated Statement of Facts ¶ 9 [hereinafter Pl.'s CSF]. Aware that the previous tenant had experienced plumbing issues, Plaintiff engaged consultants to investigate and remedy these issues, which Plaintiff contends were resolved at that time. *Id.*

Less than a year into the Lease, on July 12, 2004, 2100 Partners, L.P. sold the property to MetLife. Doc. 202, Defs.' Consolidated Statement of Facts 10 [hereinafter Defs.' CSF]. Upon purchasing the property, MetLife contracted with the previous property manager—Trammell Crow Company, which merged with CB Richard Ellis, Inc. in December 2006 and later became CBRE—to continue managing the property. Doc. 202, Defs.' CSF 11; Doc. 280, Pl.'s CSF ¶ 11.

On June 2, 2009, Plaintiff notified CBRE that it was "seeing a TON of movement in the building lately," specifically complaining of drywall damage, an inoperable door, and an expanding crack in the concrete floor of the kitchen area. Defs.' App. 100. CBRE sent an employee to observe

---

[4]The 2,314 pages of Defendants' summary judgment evidence is scattered across documents 200–01, 203–05, 207, and 209 in the electronic court record. Therefore, for ease of reference, the Court will omit the electronic document numbers and instead refer directly to the page numbers as labeled in Defendants' Appendix when citing to this material. The 3,741 pages of Plaintiff's summary judgment evidence being likewise spread across documents 265–70, the Court will follow the same convention when referencing Plaintiff's Appendix. Finally, although included at various locations in the record, the 130 pages of the Lease Agreement—including the First, Second, and Third Amendments—are found at Defs.' App. 1841–1991. Going forward, references to the Lease Agreement will cite simply to the section of the agreement itself rather than to the page number where it is found in either side's appendix (*e.g.*, Lease Agreement § 7(b)(ii)).

the damage, engaged a contractor to rule out the possibility that a leak under the building was causing the movement, and notified MetLife of the issue. Doc. 202, Defs.' CSF 12–13; Defs.' App. 1698. Having determined that the plumbing lines beneath the building were intact, CBRE hired a structural engineer to investigate the cause of the cracking. Doc. 202, Defs.' CSF 13. CBRE's structural engineer believed that soil expansion, or heave, under the east side of the building was the most likely cause. *Id.* Thus, in the summer of 2009, CBRE and MetLife began a "phased investigation" to determine the cause of the heave. *Id.* This so-called "phased investigation" is at the center of the dispute between the parties. Defendants contend that the "phased investigation" was necessary to systematically eliminate possible causes of the heave, starting with the most likely and moving to the least likely. *Id.* Plaintiff, on the other hand, argues the "phased investigation" was merely a ruse to delay necessary repairs and ultimately drive Sambuca out of the leased property in favor of a more profitable tenant. Doc. 280, Pl.'s CSF ¶¶ 17–18.

The investigation started with the excavation of two test pits to observe the voids underneath the grade beam in July 2009. Doc. 202, Defs.' CSF 13; Doc. 280, Pl.'s CSF ¶ 18. The following month, CBRE's structural engineer also ordered the excavation and examination of the flume trench drain. Doc. 202, Defs.' CSF 14. Neither revealed the cause of the heave, and in August 2009, CBRE's structural engineer recommended additional geotechnical testing. *Id.* In September 2009, Sambuca experienced a partial drain line collapse, which it attributed to the "movement" issues previously reported to CBRE. Doc. 280, Pl.'s CSF ¶¶ 19–21; Doc. 202, Defs.' CSF 18–19. Sambuca hired a plumber to replace the collapsed portion of the drain line, and upon CBRE's recommendation, MetLife reimbursed Sambuca for the repair. Doc. 280, Pl.'s CSF ¶¶ 19–21; Doc.

202, Defs.' CSF 18–19. Sambuca's plumber recommended replacing additional portions of the drain lines, as did Defendants' own contractor, but "CBRE decided to continue the ongoing investigation that [Defendants] had started in June" instead. Doc. 202, Defs.' CSF 16–17.

Sambuca "continued to experience significant structural movement and related distress" throughout the fall of 2009 and, on November 3, 2009, sent a letter to CBRE detailing the ongoing issues. Doc. 280, Pl.'s CSF ¶ 21; Pl.'s App. 2445. Plaintiff sent an additional letter noting "increasing foundation issues and expenses incurred . . . in relation to such" on December 8, 2009. Doc. 280, Pl.'s CSF ¶ 21; Pl.'s App. 2471. In February 2010, CBRE ordered the geotechnical tests previously recommended by its structural engineer, however, the additional testing did not reveal the cause of the structural movement. Doc. 280, Pl.'s CSF ¶ 23; Doc 202, Defs.' CSF 19–20. CBRE also re-tested the plumbing lines for leaks in March 2010—and found none—and sent cameras down the grease drain lines. Doc 202, Defs.' CSF 19–20. CBRE's structural engineer also recommended a zip elevation survey, which MetLife paid for in June 2010. *Id.* Although both Plaintiff's and Defendants' consultants recommended replacing additional sections of the drain lines, MetLife "decided to hold off on replacing the main drain lines" because these "geotechnical tests did not indicate that drain lines were leaking and causing the heave." *Id.*

In July 2010, Sambuca again notified CBRE that it was experiencing building distress. *Id.* at 21. CBRE's structural engineer inspected the building again in August 2010 but was still unable to locate the cause of the movement. *Id.* at 22. He recommended waiting another six months to conduct a second elevation survey. *Id.* In the meantime, CBRE hired a contractor to apply epoxy to fill the cracks in the floor. *Id.* In March and April 2011, MetLife paid for the second floor elevation

survey and hired a contractor to re-camera the drain lines, which revealed broken and missing sections of pipe in the lines. *Id.*

During the summer of 2011, Plaintiff sent several additional notices to MetLife and CBRE documenting the issues it continued to experience and complaining about the length of the investigation. *Id.* On August 22, 2011, CBRE responded by letter that the drainage and foundation issues at the property were "one-in-the-same" and that CBRE planned to completely replace the two primary drain lines at Sambuca beginning in January 2012 to "correct defects caused by movements in foundation." Defs.' App. 744. Later, on November 8, 2011, Defendants' counsel also informed Plaintiff that after the drain line replacement project was completed, it would take 12 to 18 months for the ground to "fully settle," after which "the remaining repairs to the structural system of the building [would] then be completed." Doc. 280, Pl.'s CSF ¶ 30. Plaintiffs contend such representations were made to them repeatedly by various representatives of both CBRE and MetLife. *Id.* Although Plaintiff expressed doubt—both before and after the drain line replacement project—that the drainage and plumbing issues were causing the foundation movement, Plaintiff contends it went along with the repair plan with the understanding that all of the structural issues would eventually be addressed after the ground "settled." *Id.* ¶¶ 27–35.

The drain line replacement project began in January 2012 and was completed in March 2012. *Id.* ¶ 37. MetLife paid for the project, which was completed after hours so Sambuca did not have to shut down the restaurant. Doc. 202, Defs.' CSF 25–26. On April 19, 2012, Sambuca reiterated to CBRE by email that it did not believe the drainage issues were causing the foundation movement. Defs.' App. 304–08. In response, MetLife sent a letter on May 3, 2012, stating it was "confident,

although unable to guaranty, that the primary source of moisture under the foundation [had] been remedied" and that Defendants were "past the stage of expending additional time and money on further research and work unless and until it is determined that the work performed to date does not solve the problem." Pl.'s App. 2376–78.

Plaintiff contends that movement-related issues continued during the summer of 2012, and Plaintiff sent another letter expressing its position to MetLife on August 31, 2012. Pl.'s App. 77. MetLife agreed to pay for a soil analysis, which was conducted in February 2013. Doc. 202, Defs.' App. 29–30. The results of that study indicated that all "observation wells were observed to be dry on each of the three consecutive weekly readings," meaning that "either the source of water under the floor slab has been corrected or the available water under the slab has temporarily been distributed to the dryer surrounding area." Defs.' App. 1539. Thus, the results of soil testing were, yet again, inconclusive as to the cause of the movement.

Despite these ongoing issues, Plaintiff notified MetLife on March 22, 2013, of its intention to exercise the first five-year renewal option in the Lease. Doc. 280, Pl.'s CSF ¶¶ 39–40. The Lease provided that renewal rent would be determined by the "Market Rate" at the time of renewal, and it outlined a method for determining the Market Rate in the event that the parties disagreed on the rate. Lease Agreement, Ex. E ¶ 2. The parties were not able to agree on a Market Rate using the procedures provided in the Lease, so Plaintiff filed the current suit in state court in October 2013. Notwithstanding the pending lawsuit, the parties executed the Third Amendment to the Lease on March 31, 2014, which left the rental rate unchanged "until such time as the Market Rate is finally determined in accordance with Exhibit E to the Lease." Lease Agreement, 3d Am. ¶ 3.

On October 23, 2015, MetLife transferred the leased premises to MCPP as part of a larger transaction by which it transferred several real estate assets to MCPP-affiliated entities across the country. Doc. 202, Defs.' CSF 35. Defendants admit, however, that MetLife "continues to oversee the Premises on behalf of MCPP," and "CBRE continues to manage the Premises." *Id.*

B.    *Procedural History*

Plaintiff initially filed suit against only MetLife in Texas state court on October 7, 2013. Doc. 2, Notice of Removal, App. 4–17. The original state court petition included only claims for breach of contract and repudiation/anticipatory breach of contract, as well as requests for specific performance and declaratory judgment. *Id.* at 12–15. Based on information received in discovery in the breach of contract suit, Plaintiff later amended the state court petition on June 13, 2014, adding CBRE as a defendant and asserting the following tort causes of action against both CBRE and MetLife: (1) fraud; (2) negligent misrepresentation; (3) civil conspiracy; and (4) aiding and abetting.[5] Doc. 3, Notice of Removal, App. 249–69. The amended state court petition also added an additional contract-based claim for breach of the warranty of quiet enjoyment against MetLife. *Id.* at 262–63.

CBRE timely removed the case to this Court based on diversity jurisdiction. Doc. 1, Notice of Removal. Plaintiff filed its Second Amended Complaint on August 11, 2014 (doc. 13), and its Third Amended Complaint on August 22, 2014 (doc. 17). The Third Amended Complaint added a request for rescission of the Lease renewal. Doc. 17, 3d Am. Compl. ¶ 82.

Because MetLife subsequently sold the leased premises to MCPP, Plaintiff's Fourth Amended

---

[5]This Court later dismissed the aiding and abetting claims. Doc. 25, Order 29–30. Additionally, although not separately pled, this Court also dismissed Plaintiff's claims for fraudulent inducement, to the extent such a claim was raised by the factual allegations in Plaintiff's pleading. *Id.* at 18–21.

Complaint added MCPP as a defendant on and asserted the following claims against it as the current property owner: (1) breach of contract; (2) repudiation/anticipatory breach of contract; and (3) breach of the warranty of quiet enjoyment. Doc. 120, 4th Am. Compl. ¶¶ 41–53. Plaintiff also requested specific performance and declaratory judgment regarding MCPP. *Id.* ¶¶ 79–84.

Defendants each filed motions for summary judgment on all claims asserted against them on June 17, 2016. Defendants filed a single consolidated statement of facts (doc. 202) and individual motions for summary judgment (docs. 194, 195, 196) with briefs in support (docs. 197, 198, 199). Plaintiff responded with a single consolidated statement of facts (doc. 280) and individual responses (docs. 277, 278, 279), and Defendants replied (docs. 294, 295). Defendants' motions for summary judgment are ripe for review.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the non-movant ultimately bears the burden of proof at trial, however, the movant may satisfy its burden just by pointing to the absence of evidence supporting the non-movant's case. *Id.* at 322–23.

If the movant meets its burden, then the burden shifts to the non-movant to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Seque Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

In determining whether a genuine issue exists, the Court views the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Rather, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot do so, then the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

# III.

# ANALYSIS

Before getting to the summary judgment motions themselves, there are two preliminary matters the Court must address: (1) the motions to strike, exclude or limit the testimony of experts; and (2) each side's evidentiary objections to the other's summary judgment evidence.

A.    *Motions to Strike, Exclude, or Limit Expert Testimony*

Defendants filed their motions for summary judgment on June 17, 2016. Docs. 194, 195, 196. Before Plaintiff could respond to the motions for summary judgment, Defendants filed motions to strike or exclude the testimony of fourteen of Plaintiff's designated experts. *See supra* note 1. Plaintiff responded to each motion, and Defendants replied in turn. After reviewing the vast summary judgment and expert challenge record, the Court notes that Defendants' summary judgment motions are intertwined with, and in large part predicated upon, their  challenges to Plaintiff's experts. For example, Defendants attack the causation and damages aspects of each cause of action, arguing that Plaintiff has no evidence of legally recoverable damages attributable to each cause of action, as well as that the economic loss doctrine bars recovery on Plaintiff's tort claims. The Court finds these issues would be better addressed at or shortly before trial. Therefore, rather than decide the expert issues on the papers at this time, the Court **DENIES without prejudice** all of  Defendants' challenges to Plaintiff's experts, subject to those motions being re-raised at trial.[6] To the extent Defendants' summary judgment motions rely on the expert challenges (*i.e.*, Defendants' arguments regarding damages, causation, and the economic loss doctrine), those portions of the motions for

---

[6]To be clear, electronic docket numbers 215, 217, 223, 226, 228, 231, 233, and 256 are hereby **DENIED without prejudice**.

- 11 -

summary judgment are also **DENIED** at this time.

In apparent response to Defendants' barrage of expert challenges, Plaintiff launched its own attack on ten of Defendants' experts. *See supra* note 2. Defendants responded to each motion, and Plaintiff replied in turn. In the interest of fairness, and because the Court determines these issues can be best handled at or shortly before the time of trial as noted above, Plaintiff's challenges to Defendants' experts are likewise **DENIED without prejudice** at this time, subject to their being re-raised at trial.[7]

B.      *Objections to Summary Judgment Evidence*

Next, the Court turns to the parties' evidentiary objections, beginning with Defendants' objection to Plaintiff's summary judgment evidence.

1.      Defendants' Objection to Plaintiff's Summary Judgment Evidence

Defendants' sole objection to Plaintiff's summary judgment evidence regards a single statement in the affidavit of Kim Forsythe, Sambuca's founder and co-owner. Doc. 287, Defs.' Obj. to Pl.'s Summ. J. Evid [hereinafter Defs.' Obj.]. Defendants object to Forsythe's statement that "[t]he economic damages suffered by Sambuca as a result of Defendants' breach of contract and fraud through May 19, 2016, are set forth by year in Exhibit H hereto, which is incorporated herein by reference." Doc. 287, Defs.' Obj. 1. Defendants apparently find objectionable the insinuation that Sambuca's damages were "a result of" Defendants alleged conduct. They argue this causation opinion linking Sambuca's economic damages to Defendants' conduct is conclusory and unreliable and was not properly disclosed. *See generally* doc. 287. The Court, however, finds this objection redundant

---

[7]That is, electronic docket numbers 235, 237, 239, 241, 243, 247, 249, 251, 253, and 255 are hereby **DENIED without prejudice**.

of Defendants' Motion to Strike Plaintiff's Designation and Exclude Expert Testimony of Non-retained Experts Kim Forsythe, Debbie Barber, Laura Dalager, and Jamie Spurgeon (doc. 228), which the Court has already denied without prejudice above. Therefore, Defendants' objection is **OVERRULED** at this time.

2.     Plaintiff's Objections to Defendants' Summary Judgment Evidence

Plaintiff raised numerous objections to Defendants' summary judgment evidence (doc. 263), to which Defendants responded (doc. 289). In reply, Plaintiff withdrew several objections but stood on a handful of others. Doc. 336, Pl.'s Reply. As to those remaining objections identified in Plaintiff's Reply (doc. 336), the Court agrees with the reasoning provided by Plaintiff for each objection and **SUSTAINS** the objection and **STRIKES** the evidence from the summary judgment record with the following exceptions:

i.     *Emails from Kari Delamore (CBRE) to Jill Boyd (Sambuca)*

Plaintiff objected to three emails offered by Defendants. Doc. 263, Pl.'s Obj. 3. The emails were from Kari Delamore of CBRE to Jill Boyd of Sambuca and were sent in August 2011 and January 2012. Doc. 263, Pl.'s Obj. 3. The first email was from August 30, 2011, in which Delamore explained that Defendants were waiting on a response from their engineering team regarding whether they would be able to repair the "cosmetic" issues immediately after the drain line replacement, or whether they would need to wait "to allow for settling." Defs.' App. 1118–19. Presumably having received a response, Delamore notified Boyd the following day that Defendants would need to wait until the ground dried out. *Id.* at 1118. The third email, dated January 21, 2012, confirms that the drain line replacement project was scheduled to begin on January 29, 2012, and notes that

Defendants would reassess what steps should be taken once the replacement was completed. *Id.* at 1120. Plaintiff argues these "emails contain hearsay statements which are not admissible without a hearsay exception." Doc. 263, Pl.'s Obj. 3. However, Plaintiff submitted the exact same three emails in its own summary judgment evidence. Pl.'s App. 3078 (Aug. 30, 2011 email), 3075 (Aug. 31, 2011 email), 2928 (Jan. 21, 2012 email). Therefore, Plaintiff's objections to these emails are **OVERRULED**. *See Dark. v. Hous. Methodist San Jacinto Hosp.*, No. H-14-3540, 2016 WL 2770545, at *2 n.13 & 14 (S.D. Tex. May 12, 2016).

        *ii.*      *Daniel Cantu deposition excerpt*

       Next, Plaintiff objected to a portion of the deposition testimony of Daniel Cantu, former chief engineer at CBRE, in which Cantu answered a question posed by Plaintiff's counsel regarding why Defendants would have hired their own plumbing contractor to investigate the drain line if Plaintiff's plumber had already repaired the issue. Doc. 263, Pl.'s Obj. 4. At the deposition, Plaintiff's counsel asked Cantu the following question:

> Q: Okay. Now, if -- if EPS corrected and repaired the issues, then why would it be necessary for you to hire TDI to do additional investigation of the main drain line?

Defs.' App. 361, Dep. of Daniel Cantu 87:3–6. And Cantu answered as follows:

> A: It was because maybe the building was still moving. I -- I don't recall. I mean, it was -- there was a reason why, but I just don't recall right now. But if -- if -- if we have TD -- TDI come back after those folks, it's either I was inspecting EPS' work to make sure everything was done right or maybe because the building was still moving and we need to do some more in-depth investigation on it.

Defs.' App. 361, Dep. of Daniel Cantu 87:7–14.

       Plaintiff objected that "[t]hese statements are impermissible speculations and are not based on personal knowledge." Doc. 263, Pl.'s Obj. 5. Defendants responded that it was Plaintiff's own

counsel who asked the question, and "[t]he fact that Sambuca did not like the answers it elicited is not a basis to exclude the testimony." Doc. 289, Defs.' Resp. to Pl.'s Obj. 11.

As Plaintiff notes, every witness must have personal knowledge of the matter about which they testify, regardless of who asks the question. *See* Fed. R. Evid. 602. However, the Court finds that, as chief engineer at CBRE, Cantu did have the requisite personal knowledge and was not speculating. Plaintiff asked why it would be necessary for CBRE to hire its own contractor; Cantu gave two reasons why it might be necessary: (1) to make sure the work was done right; or (2) because more investigation was needed. Therefore, Plaintiff's objection is **OVERRULED**.

      *iii.*     *Corporate representative deposition*

Finally, Plaintiff objects to several excerpts from the deposition of its corporate representative, Debbie J. Barber, as being outside the scope of the Rule 30(b)(6) notice. Doc. 263, Pl.'s Obj. 5. For each objection, Plaintiff contends that, "[a]s objected to in the deposition, this line of questions seeks inquiry into topics outside those designated for the deposition. Consequently, the statements are made without sufficient personal knowledge and are speculative." *Id.* Defendants responded that Barber was designated as Sambuca's corporate representative on all topics related to damages and that all of the testimony to which Sambuca objects was within the scope of the noticed Rule 30(b)(6) topics. Doc. 289, Defs.' Resp. to Pl.'s Obj. 12. In reply, Plaintiff argues that because the questions reference topics outside the 30(b)(6) notice "[n]one of those questions or corresponding answers from Ms. Barber's corporate representative deposition can bind Sambuca," and therefore "they all should be excluded from the summary judgment record." Doc. 336, Pl.'s Reply to Defs.' Resp. to Pl.'s Obj. 10–11.

As an initial matter, Plaintiff has not directed the Court to the Rule 30(b)(6) deposition notice for the Court to determine whether the line of questioning was or was not within the scope of the notice. However, assuming that Barber was designated as Sambuca's corporate representative "on all topics related to damages" as Defendants allege (and Plaintiff did not dispute), it would appear to the Court that the questions and answers objected to fall within that general scope. Finally, even if the questioning was outside the scope of the 30(b)(6) notice, the Court is not convinced that excluding the evidence would be necessary. Plaintiff is correct that "questions and answers exceeding the scope of the 30(b)(6) notice will not bind the corporation." *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, 4:12-CV-543, 4:12-CV-461, 2016 WL 2997120, at *9 (E.D. Tex. May 24, 2016) (citing *Falchenberg v. N.Y. State Dep't of Educ.*, 642 F. Supp. 2d 156, 164 (S.D.N.Y. 2008); *Detoy v. City and Cty. of S.F.*, 196 F.R.D. 362, 367 (N.D. Cal. 2000); *King v. Pratt & Whitney, a Div. of United Techs., Corp.*, 161 F.R.D. 475, 476 (S.D. Fla. 1995), *aff'd sub nom*, *King v. Pratt & Whitney*, 213 F.3d 646 (11th Cir. 2000)). Such questions and answers "are merely treated as the answers of the individual deponent." *Falchenberg*, 642 F. Supp. 2d at 164. Therefore, even if the questions and answers were outside the scope of the notice, they would merely be the answers of Debbie J. Barber. Thus, Plaintiff's objections to the questions and answers of its designated corporate representative are **OVERRULED**.

C.    *Summary Judgment Motions*

The Court now turns to the substance of Defendants' summary judgment motions. As noted above, Plaintiff asserts both tort and contract-based claims against MetLife, only contract claims against MCPP, and only tort claims against CBRE. Doc. 120, Pl.'s 4th Am. Compl. Each defendant

has moved for summary judgment on every claim asserted against it. The Court would normally proceed by addressing each defendant's motion for summary judgment one by one, however, in this case it makes sense to organize the discussion based on cause of action rather than by motion. Thus, the Court begins with a discussion of MetLife's motion for summary judgment with regard to the contract-based claims asserted against it as the property owner at the time the alleged breach began. Then it will move to MCPP's motion for summary judgment regarding the contract claims asserted against MCPP as the current property owner. Next, it will address MetLife's and CBRE's motions for summary judgment with regard to Plaintiff's tort causes of action against them. And finally, the Court will discuss the motions for summary judgment as they relate to Plaintiff's requests for declaratory judgment and equitable relief.

1.   MetLife's Motion for Summary Judgment on Plaintiff's Contract-based Claims

Plaintiff asserted three causes of action against MetLife stemming from the Lease Agreement: (1) breach of the agreement; (2) repudiation/anticipatory breach of the agreement; and (3) breach of the express warranty of quiet enjoyment in the Lease. Doc. 120, Pl.'s 4th Am. Compl. ¶¶ 41–53. Though different causes of action with different elements, the allegations and evidence supporting all three claims are the same: that MetLife failed to "keep and maintain the structural system of the building in good condition and repair" as required under § 7(b)(ii) of the Lease. *Id.* ¶ 42. Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l*,

*L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

In support of its claim for repudiation/anticipatory breach of contract, Plaintiff contends that, following the renewal of the Lease, MetLife has taken the position that "certain language in the renewal option . . . obviated . . . any obligation to repair areas affected by the structural movement." Doc. 120, Pl.'s 4th Am. Compl. ¶ 29. According to Plaintiff, MetLife has "made clear that [it] has no intention of complying with its Lease obligations." *Id.* To prevail on a claim for anticipatory breach in Texas, a plaintiff must establish: (1) an absolute repudiation of the obligations; (2) a lack of just excuse for the repudiation; and (3) damage to the nonrepudiating party. *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 630 (N.D. Tex. 2010) (citing *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004)).

As to Plaintiff's third contract-based claim, Plaintiff contends MetLife's failure to maintain the structural system of the premises violated the express warranty of quiet enjoyment in the Lease, which provides as follows:

> Provided Tenant has performed all of the terms and conditions of this Lease to be performed by Tenant, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, subject to the terms and conditions of this Lease.

Doc. 120, Pl.'s 4th Am. Compl. ¶ 50 (citing Lease Agreement § 23(h)). The elements of a traditional claim for breach of the covenant of quiet enjoyment are: "(1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises; (2) a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises; (3) an act that permanently deprives the tenant of the use and enjoyment of the premises; and (4) abandonment of the premises by the tenant within a reasonable time after the commission of the act." *Lazell v.*

*Stone*, 123 S.W.3d 6, 11–12 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (holding that the elements of a breach of the warranty of quiet enjoyment are the same as the elements in constructive eviction claim); *see also Goldman v. Alkek*, 850 S.W.2d 568, 572 (Tex. App.—Corpus Christi 1993, no writ).

MetLife acknowledges that the "essence of all of Sambuca's contract claims (whether styled as a breach of contract, repudiation, anticipatory breach, or breach of the express covenant of quiet enjoyment) is the same—that MetLife failed to make repairs to the Premises." Doc. 197, MetLife's Br. in Supp. of Mot. for Summ. J. 23 [hereinafter MetLife's Br.]. Instead of attacking specific elements of each contractual claim, however, MetLife asserts the affirmative defenses of waiver and ratification.[8] First, MetLife contends that § 17 of the Lease waives all damages other than actual, direct damages for any breach of the Lease Agreement. Doc. 197, MetLife's Br. 11–13. Second, MetLife argues that Sambuca waived any breach it now complains of when Plaintiff signed the Second Amendment to the Lease in 2004, prior to the sale of the leased premises from 2100 Partners, L.P. to MetLife. *Id.* at 24–25. And third, MetLife argues that Sambuca ratified any alleged breach of contract when it renewed the Lease and signed the Third Amendment in 2014. *Id.* at 23. The Court will address each of MetLife's defenses.

---

[8]MetLife does dispute causation and damages with regard to all of the claims asserted against it; however, as noted above, those issues are inextricably intertwined with the expert issues the Court has deferred until trial and are not addressed in this decision. Also, while MetLife's motion (doc. 194) singles out two elements of the claim for breach of the warranty of quiet enjoyment, MetLife does not address this claim—much less these particular elements—in its brief (doc. 197). Furthermore, as this Court has previously noted, "[s]ubmission of the question on breach of the lease's warranty of quiet enjoyment [is] proper . . . if legally and factually sufficient evidence show that [a defendant] breached the express warranty of this lease by hindering [a plaintiff] in his occupation and enjoyment of the property." *Goldman*, 850 S.W.2d at 572; *see* doc. 25, Order 30–32. Because the Court finds that Plaintiff has raised a fact issue as to whether MetLife breached the express warranty of quiet enjoyment in this Lease, MetLife's motion for summary judgment on the quiet enjoyment claim is **DENIED**.

    *i.  Consequential damages waiver*

  First, MetLife argues that § 17 of the Lease Agreement waives all damages other than actual, direct damages for any alleged breach of the Lease Agreement. *Id.* at 11–13. Plaintiff responds that § 17 is unenforceable as a damages waiver because it was not "conspicuous." Doc. 278, Pl.'s Br. in Supp. of Resp. to MetLife's Mot. for Summ. J. 16 [hereinafter Pl.'s Br.].[9] As Plaintiff notes, "[w]aiver is an affirmative defense and the party alleging waiver has the burden of proof." *Walkup v. Tyson Foods, Inc.*, No. 7:13-CV-0150-O, 2014 WL 4798443, at *3 (N.D. Tex. Sept. 26, 2014) (citing *JM Walker LLC v. Acadia Ins. Co.*, 356 F. App'x 744, 748 (5th Cir. 2008)). Therefore, MetLife has the burden to prove as a matter of law that Plaintiff waived all damages other than actual, direct damages for breach of the Lease Agreement.

  Section 17 of the Lease, titled "Landlord's Default/Tenant's Remedies," provides in pertinent part as follows:

> Tenant's remedies for default hereunder and for breach by Landlord of any of its obligations hereunder will be limited to a suit for actual and direct damages and/or injunction. . . . The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to only Tenant's actual direct damages therefor . . . . In no event shall Landlord be liable to Tenant for consequential, punitive or special damages (or any similar types of damages) by reason of a failure to perform (or a default) by Landlord hereunder or otherwise.

Lease Agreement § 17. Plaintiff argues this provision is unenforceable because the "damages waiver is buried at the end of a page-long, uniform paragraph, generically entitled 'Landlord's Default/Tenant's Remedies,' with no (1) contrasting type, font or color; (2) capitalization; (3) no

---

[9]Plaintiff also argues that, in the event the waiver is found to be enforceable, all of its claimed damages are direct rather than consequential. Doc. 278, Pl.'s Br. 16. However, the classification of Plaintiff's damages as either direct or consequential is not addressed in this decision.

symbols or other marks to call attention to it; (4) and no heading that would attract the attention of a reasonable person." Doc. 278, Pl.'s Br. 16.

"A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 179 (5th Cir. 2016) (citing *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex. 1993)). "Whether a term is 'conspicuous' or not is a decision for the court." Tex. Bus. & Com. Code Ann. § 1.201(b)(10). Conspicuous terms include "a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding test of the same or lesser size" or "language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." *Id.*

The Court agrees that the waiver language in § 17 is not in contrasting type, color, or font compared to the surrounding text; it has no special symbols or marks; and it uses no special capitalization. It also comes on pages 24 and 25 of a 38-page Lease with almost 100 additional pages of exhibits and amendments. The Court therefore agrees with Plaintiff that the waiver is not conspicuous. *Cf. Yumilicious Franchise, L.L.C. v. Barrie*, No. 3:13-CV-4841-L, 2015 WL 1856729, at *8–10 (N.D. Tex. Apr. 23, 2015), *aff'd*, 819 F.3d 170, 179 (5th Cir. 2016) (finding a damages waiver was conspicuous as a matter of law where the heading was in bold, all capitals, and underlined and where the waiver provision itself was in bold and all capitals).

"[O]nce a court determines that a disclaimer is not conspicuous . . ., it may still give effect to the disclaimer if it is shown that the [plaintiff] had actual knowledge of the disclaimer." *Am. Eagle*

*Ins. Co. v. United Techs. Corp.*, 48 F.3d 142, 146 (5th Cir. 1995) (citing *Cate v. Dover Corp.*, 790

S.W.2d 559, 561 (Tex. 1990)). "In other words, actual knowledge of the disclaimer overrides the

question of conspicuousness." *Id.* MetLife argues that even if the waiver was not conspicuous,

Plaintiff was represented by competent counsel and had actual knowledge of the waiver, evidenced

by the fact that Plaintiff's previous counsel who negotiated the Lease, in a November 2011 email to

Plaintiff's present counsel, acknowledged that "[t]he lease calls for limited remedies to the Tenant,

specifically excluding consequential damages." Doc. 294, MetLife's Reply 11–12; Defs.' App.

2013–14. Additionally, MetLife argues, Plaintiff twice acknowledged the consequential damages

waiver: once when it signed the First Amendment to the Lease in 2003, and again when it signed

the Second Amendment in 2004. Doc. 294, MetLife's Reply 12.

The First Amendment, executed on December 31, 2003, between Plaintiff and non-party

2100 Partners, L.P., is four pages long and includes 11 numbered paragraphs. Lease Agreement, First

Amendment. The last numbered paragraph before the signature lines is titled "**<u>EXCULPATION</u>**."

Lease Agreement, First Amendment ¶ 11. The title is in bold, all capitals, and is underlined. *Id.* The

paragraph states: "This Amendment and the obligations of Landlord hereunder are and shall be and

remain subject to and limited by the exculpation and limitations of Landlord's liability as are set forth

in the Lease (including, without limitation, pursuant to <u>Section 17</u> thereof)." *Id.*

The Second Amendment, executed on July 8, 2004, again between Plaintiff and non-party

2100 Partners, L.P., is 11 pages long. Lease Agreement, Second Amendment. The final numbered

paragraph—again the last before the signature lines—repeats: "This Second Amendment and the

obligations of Landlord hereunder are and shall be and remain subject to and limited by the

exculpation and limitations of Landlord's liability as are set forth in the Lease (including, without limitation, pursuant to Section 17 thereof)." Lease Agreement, Second Amendment ¶ 16.

A "history of signing lease agreements containing the same . . . waiver language evidences an understanding of the provision and a willingness to be bound by it." *In re Key Equip. Fin. Inc.*, 371 S.W.3d 296, 302–03 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also Glidden Co. v. CDNE, Inc.*, No. 12-09-00283-CV, 2011 WL 686286, at *7–8 (Tex. App.—Tyler Feb. 28, 2011, no pet.) (holding it was "unnecessary for the language in [the] disclaimer of the consequential damages to be conspicuous" where there was "evidence that the disclaimer of these consequential damages remained the same throughout the course of dealing between the two parties" over the course of nine years).

Plaintiff does not contend that the waiver was ambiguous or that Plaintiff lacked knowledge of the provision; it merely argues the waiver language was not conspicuous. However, after review of the summary judgment evidence and briefing, the Court concludes as matter of law that the unambiguous consequential damages waiver in § 17 of the Lease limits any damages for an alleged breach of the Lease Agreement to "actual direct damages." Thus, MetLife's motion for summary judgment on Plaintiff's breach of contract claims is **GRANTED in part** such that damages for any alleged breach of the Lease Agreement are limited to actual, direct damages.

> ii.     *Second Amendment*

MetLife next argues that Plaintiff "waived the plumbing and foundation-related construction defects and deficiencies" it now complains of when it signed the Second Amendment to the Lease in 2004. Doc. 197, MetLife's Br. 23. MetLife contends the structural issues Plaintiff has experienced

since 2009 are the same ones it was aware of in early 2004, and thus, MetLife reasons, were waived with the signing of the Second Amendment on July 8, 2004. *Id.* at 24. As noted above, waiver is an affirmative defense for which MetLife bears the burden of proof. *Tyson Foods*, 2014 WL 4798443, at *3. Therefore, to be entitled to summary judgment on its waiver defense, MetLife must establish as a matter of law that Plaintiff waived the currently alleged breach of the Lease Agreement by signing the Second Amendment in 2004.

According to MetLife, disputes had already arisen between Plaintiff and 2100 Partners, L.P. over issues "related to the foundation and plumbing" before the previous property owner sold the leased premises to MetLife in July 2004. Doc. 197, MetLife's Br. 24. MetLife points to the fact that Plaintiff hired a plumber and a structural engineer to evaluate plumbing and foundation issues in early 2004, before opening the restaurant at the Uptown location. Doc. 202, Defs.' CSF 6–9. For example, MetLife notes that in February 2004, Plaintiff's plumber indicated that the "plumbing system [was] not proper" and that "most assuredly, [Sambuca] will have trouble." Defs.' App. 1334. After recommending a series of repairs in March 2004, the plumber noted Plaintiff had "a poorly designed, installed and possibly shifting system that has and will still have problems" even with the recommended repairs. *Id.* at 1339. Also in March 2004, Plaintiff's structural engineer stated that "[t]he foundation of the building has experienced a combination of heave at the West end and a minor settlement at the East end." Defs.' App. 1011. Plaintiff's structural engineer also noted that "differential movement is the probable cause of cracks in the foundation at the North Central side of the building" and recommended that Plaintiff "consult with a foundation repair company." *Id.* MetLife contends these issues are the same ones Plaintiff now complains of in the present suit and

thus were waived when Plaintiff signed the Second Amendment. Doc. 197, MetLife's Br. 24.

For its part, Plaintiff argues the Second Amendment "unequivocally did not address the issues in this lawsuit" because those issues "did not exist at the time of that amendment." Doc. 278, Pl.'s Br. 25. Plaintiff contends that any issues in early 2004 were repaired to its satisfaction before the transfer of ownership and that "[t]he structural movement and related distress and problems that would later develop at the Leased Premises beginning in 2009 as a result of the structural movement are distinctly different than any problem of which Sambuca was aware in 2003 or 2004." Doc. 280, Pl.'s CSF ¶ 9.

Plaintiff and non-party 2100 Partners, L.P. signed the Second Amendment on July 8, 2004, four days before the sale of the leased premises from 2100 Partners, L.P. to MetLife. Lease Agreement, Second Amendment; Doc. 202, Defs.' CSF 10. The full title of the amendment is "SECOND AMENDMENT TO LEASE AGREEMENT (INCLUDING SETTLEMENT AGREEMENT AND MUTUAL RELEASE)." Lease Agreement, Second Amendment 1. It stated that "certain disputes have arisen between [2100 Partners, L.P.] and [Sambuca] as to, among other things," the following issues:

    (i)     the allocation of responsibilities between the parties for payment of certain construction costs;

    (ii)    the effect or cost of certain delays alleged to have occurred in connection with the construction and complete of the Landlord Work (as defined in the Lease) and the Finish Work (as defined in the Lease);

    (iii)   the entitlement and/or effecting of payment and disbursement of the Finish Allowance (as defined in the Lease); and

    (iv)   in connection with certain alleged construction defects and/or deficiencies as set forth in that certain Tenant Estoppel Certificate submitted by Tenant to

>Landlord pursuant to correspondence from Tenant's counsel dated July 2, 2004 ("Estoppel Certificate").

Lease Agreement, Second Amendment 1.

In the Second Amendment, however, Sambuca acknowledged that all "construction work and improvements" required under the Landlord Work and finish-out provisions of the original Lease had been satisfied "except for those certain matters described in Paragraph 2 below and further excepting ongoing items of repair and maintenance that are to be addressed in accordance with the terms and conditions of the lease." Lease Agreement, Second Amendment ¶ 1. In Paragraph 2, 2100 Partners, L.P. agreed to undertake the following:

(i)     pay up to $15,000 for the installation of a new awning on the side of the building;

(ii)    pay one-half of the cost of the survey required in connection with obtaining the permit for the awning;

(iii)   fix certain leaks in the kitchen floor that were identified and disclosed to 2100 Partners, L.P. prior to the date of the Second Amendment;

(iv)    reinstall the monkey grass on the parking lot side of the building;

(v)     repair and/or install gutters on the parking lot side of the building; and

(vi)    any and all other maintenance and repair obligations of Landlord under and in accordance with the terms and conditions of the Lease.

Lease Agreement, Second Amendment ¶ 2. Other than these issues, Sambuca agreed to "waive and release any and all further claims, obligations, liabilities and responsibilities of Landlord" with regard to the landlord's obligations under the Finish Allowance, Additional Allowance and Loan, Landlord Work, Additional Work, or Finish Work provisions of the Lease. *Id.* ¶ 1.

First, the Court finds that fact issues exist with regard to whether the current building issues,

of which Sambuca began complaining in 2009, are in fact the same issues Sambuca's plumber and structural engineer noted in early 2004. And even assuming they are the same, the real question is whether the waiver language in the Second Amendment covers those issues. MetLife repeatedly argues that all issues other than those specifically mentioned in paragraph two of the Second Amendment were waived. Doc. 202, Defs.' CSF 10; Doc. 197, MetLife's Br. 24. Plaintiff, on the other hand, argues that the waiver was limited to the landlord's obligations regarding those specific provisions of the Lease dealing with the initial "tenant finish-out, landlord's work and tenant's work." Pl.'s App. 2631, Dep. of Addison Wilson 94:8–10. Aside from these specific provision, Plaintiff contends the landlord's obligations—including the obligation to maintain and repair the structural system of the leased premises—otherwise remained the same. Doc. 280, Pl.'s CSF ¶ 10.

The principal aim in construing a written contract is to discern the true intent of the parties as expressed through the contract's terms. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). In determining the parties' intent, the Court looks to the objective intentions expressed in the contract itself and construes the contract's terms according to their plain meaning unless the contract itself provides an intended, different meaning. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Heritage Res. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996). "Where the contract can be given a definite legal meaning or interpretation . . . the court will construe it as a matter of law." *Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV 2618-D, 2013 WL 4045206, at *3 (N.D. Tex. Aug. 9, 2013).

Here, the Court cannot agree with MetLife that the language of the Second Amendment, as a matter of law, waived the issues Plaintiff now complains of in this lawsuit. The Second

Amendment repeatedly references the specific provisions of the Lease to which the waiver applies. The first paragraph references "Exhibits C and D to the Lease," which are the Landlord Work and finish-out provisions. Lease Agreement, Second Amendment ¶ 1. Also within the first paragraph, Sambuca agreed to "waive and release any and all further claims, obligations, liabilities and responsibilities of Landlord *with regard to the funding and disbursement of the Finish Allowance, Additional Allowance and Loan*, and further hereby acknowledges and agrees that Landlord shall have no further responsibilities *with regard to the Landlord Work, any Additional Work or the Finish Work*, under the Lease or otherwise, of any kind or nature except as set forth in Paragraph 2." *Id.* (emphasis added).

Paragraph two, which lists the items excepted from the waiver, specifically notes that "Landlord shall otherwise undertake any and all other maintenance and repair obligations of Landlord under and in accordance with the terms and conditions of the Lease." *Id.* ¶ 2. Paragraph four, after again specifically referencing the "Landlord Work," "Finish Work," and "Finish Allowance and/or Additional Allowance" provisions, provides the following:

> [T]he foregoing release does not and shall not be construed to release Landlord . . . with respect to any of [its] obligations under or pursuant to Paragraphs 1, 2 and 3 of this Agreement nor any other obligations under or pursuant to the Lease *that do not pertain to the Landlord Work, Finish Work, Finish Allowance or Additional Allowance.*

*Id.* ¶ 4 (emphasis added). MetLife would have the Court hold that the Second Agreement waived any and all issues not specifically excluded in paragraph two; however, the waiver language appears more limited than that. The Court cannot conclude as a matter of law that Sambuca's 2004 waiver of 2100 Partners, L.P.'s performance under the specific provisions of the Lease mentioned above encompassed the issues Plaintiff now complains of in the present lawsuit. Thus, summary judgment

on the affirmative defense that Plaintiff waived its current breach of contract claims by signing the Second Amendment in 2004 is **DENIED**.

      *iii.*    *Third Amendment*

Finally, with respect to the breach of contract claims against MetLife, MetLife argues that Plaintiff ratified any alleged breach when it signed the Third Amendment to the Lease in 2014. Doc. 197, MetLife's Br. 23. To prove ratification, MetLife must establish that Sambuca "(1) had full knowledge of the breach of duty or wrongdoing at the time of ratification; and (2) intentionally chose to ratify the conduct in spite of this knowledge." *Satis Vacuum Indus. Vertriebs, AG v. Optovision Techs., Inc.*, No. CIV. A. 399CV2147-M, 2001 WL 1142803, at *13 (N.D. Tex. Sept. 24, 2001) (citing *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 153 (Tex. App.—Corpus Christi 1996, no writ); *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 699 (Tex. App.—Dallas 1992, writ denied)). The party relying on the ratification has the burden "to prove knowledge of the fraud or breach and to prove a voluntary, intentional choice to ratify the contract in light of that knowledge." *Spangler v. Jones*, 797 S.W.2d 125, 131 (Tex. App.—Dallas 1990, writ denied). If the acts of ratification are controverted, however, the question becomes one for the trier of fact. *Id.* Here, the question is not whether Plaintiff had knowledge of the alleged breach at the time it signed the Third Amendment—indeed, Plaintiff had already filed a lawsuit for breach of contract by that point—but rather whether Plaintiff intended to ratify any such breach by signing it.

As noted above, Sambuca notified MetLife of its intention to renew the Lease in March 2013. Doc. 280, Pl.'s CSF ¶¶ 39–40. In addition to outlining a method for determining the renewal rate

of rent, the Lease also required the parties to execute an amendment on or before the commencement date of the renewal period containing certain renewal terms. *See* Lease Agreement, Exhibit E ¶ 1. One such term was the following:

> Landlord shall lease to Tenant during each such extended Term the Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements in connection with any such renewal period or Renewal Option.

*Id.* ¶ 1(d). Although the parties could not agree on the renewal rate of rent—leading Plaintiff to file suit in October 2013 in state court—consistent with Exhibit E, they executed a two-page Third Amendment to the Lease on March 31, 2014, which contained the above quoted language following the heading "<u>Tenant Inducements</u>." Lease Agreement, Third Amendment ¶ 4.

Apparently in reliance on the "then-current condition" language of the "Tenant Inducements" provision, MetLife now argues that any alleged breach of the Lease Agreement existing at that time was ratified by Sambuca's signing the Third Amendment. Plaintiff, on the other hand, contends the "then-current condition" language merely acknowledged that MetLife was "not obligated to provide additional money for tenant improvements." Doc. 120, Pl.'s 4th Am. Compl. ¶ 31 n.4. In essence, MetLife interprets the "then-current condition" language in the "Tenant Inducements" paragraph of the Third Amendment as a sort of "as-is" clause. The Court, however, is not persuaded. The summary judgment record clearly demonstrates that the parties were already embroiled in a lawsuit over MetLife's repair obligations and the renewal's effect on those obligations at the time the Third Amendment was signed. After reviewing the entirety of the Lease, the summary judgment evidence, and the parties' briefing, the Court cannot as a matter of law find that Sambuca's signing the Third Amendment ratifies any alleged breach of the Lease that may have

existed at the time. Thus, because MetLife has failed to carry its burden to establish this affirmative defense, summary judgment on Plaintiff's contract claims is **DENIED**.

    2.    <u>MCPP's Motion for Summary Judgment on Plaintiff's Contract Claims</u>

More than two years into this litigation, MetLife transferred the leased premises to MCPP. Therefore, in the Fourth Amended Complaint, Plaintiff added claims for (1) breach of contract, (2) anticipatory breach/repudiation, and (3) breach of the express warranty of quiet enjoyment against MCPP. Doc. 120, Pl.'s 4th Am. Compl. ¶¶ 41–53.[10] The breach of contract claims against MCPP are based on the same alleged breach Plaintiff asserts against MetLife, namely that after assuming the role of Landlord, MCPP has failed to maintain and repair the structural system as required under § 7(b)(ii) of the Lease. Specifically, Plaintiff contends that "[s]ince the sale and transfer, MCPP has taken no steps to comply with its repair obligations under the Lease" and has "indicated, through their statements, actions, and omissions that despite the continuing obligations under the Lease, [MCPP] will not provide a structurally sound building during the renewal term." *Id.* ¶¶ 40, 47. According to Plaintiff, this failure to maintain and repair the structural system also "breached the express warranty of quiet enjoyment by hindering Sambuca's occupation and enjoyment of the Leased Premises." *Id.* ¶ 53.

MCPP moved for summary judgment on all three contractual claims for essentially the same reasons as MetLife did on the contract-based claims against it. First, MCPP argues that the consequential damages waiver in § 17 of the Lease limits any damages based on a breach of the Lease

---

[10]Plaintiff also requests declaratory judgment and equitable relief affecting MCPP, however, these requests are addressed below.

to actual, direct damages. Doc. 196, MCPP's MSJ ¶ 1.[11] Second, MCPP contends that Plaintiff ratified any alleged breach of the Lease when it signed the Third Amendment. *Id.* Because Plaintiff ratified any alleged breach, MCPP also argues it cannot as a matter of law have breached or repudiated its contractual obligations as Plaintiff alleges. *Id.* Lastly, regarding the claim for breach of the warranty of quiet enjoyment, MCPP adds that Plaintiff cannot recover as a matter of law because it has not abandoned or been permanently deprived of the use and enjoyment of the premises. *Id.* ¶ 2.

As to MCPP's first argument, the Court has already analyzed the consequential damages waiver language in § 17 of the Lease in relation to the contract claims against MetLife above. The parties do not dispute that upon assuming the Lease, MCPP assumed all rights and obligations under the Lease, whatever those may have been. Therefore, for the same reasons as explained above in relation to MetLife, the Court finds that Plaintiff's damages for any alleged breach of the Lease Agreement by MCPP would likewise be limited to actual, direct damages, whatever those may be determined to be. And therefore, MCPP's motion for summary judgment is **GRANTED in part** such that damages for any alleged breach of the Lease Agreement are limited to actual, direct damages.

MCPP's ratification argument has also already been addressed but includes an additional wrinkle here as MCPP bases its challenge to the breach element of Plaintiff's contract claims on the ratification defense. Thus, the Court turns now to MCPP's argument that "Sambuca's breach of contract claim against MCPP fails as a matter of law because MCPP did not breach the lease." Doc. 199, MCPP's Br. 1.

---

[11]As should be obvious by this point, the Court does not address MCPP's arguments with regard to causation and allocation of damages.

        i.     *Breach and ratification*

First, MCPP argues it cannot be held liable for any alleged breach that occurred before the transfer of ownership from MetLife to MCPP, citing a Texas Supreme Court case for the proposition that "[t]he transferee [of an interest in leased property] will not be liable for any breach of the promise which occurred before the transfer to him." *Id.* at 2 (citing *Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 277 (Tex. 1996)). Plaintiff responds that this general rule does not apply to a "continuing breach, which passes with the lease transfer between landlords." Doc. 277, Pl.'s Resp. 5. For its continuing breach argument, Plaintiff cites the same case, *Regency Advantage. Id.* The Court agrees that *Regency Advantage* is instructive.

In *Regency Advantage*, a commercial lease required the landlord to complete "build-out" of the premises within 45 days of tenant's notification that tenant had obtained a license from the state to operate a bingo facility. *Regency Advantage Ltd. P'Ship v. Bingo Idea-Watauga, Inc.*, 928 S.W.2d 56, 58 (Tex. App.—Fort Worth 1995)*, aff'd in part, rev'd in part*, 936 S.W.2d 275 (Tex. 1996). The tenant obtained the license and notified the landlord, but the landlord neglected to build-out the space. *Id.* Several months later, the landlord sold the property and assigned the lease to the new landlord. *Id.* The new landlord informed the tenant it also had no intention of building out the space. *Id.* Therefore, the tenant sued the new landlord for breach of contract. *Id.* The Texas appellate court acknowledged that "[g]enerally, a transferee of a [lease] is not liable for a breach of the landlord's covenant that occurred before the transfer." *Id.* at 59. However, it noted that this general rule "refers to where a breach occurs at one particular point during the ownership of the original owner, not where a breach continues to occur after the original owner's grantee acquires title to the property."

*Id.* at 59 (citing 3 Milton R. Friedman, *Friedman on Leases* § 36.2 (3d ed. 1990)). Finding the breach to be of the continuing variety, the appellate court held that both the original landlord and the subsequent landlord breached the build-out provision. *Id.*

The Texas Supreme Court later reversed the appellate court, holding that the obligation to complete the build-out was a "one-time obligation, accruing forty-five days from the receipt of the approvals necessary for the lessee to operate a bingo facility." *Regency Advantage*, 936 S.W.2d at 277. The Supreme Court did not, however, disavow the idea of a continuing breach; it merely determined that the appellate court had incorrectly categorized the breach in that case as a continuing one. *Id.* In the present case, the Court agrees with Plaintiff that "the obligation to keep the structural system of the premises in good condition and repair is a continuing one that did not and could not terminate by virtue of the transfer of the Lease obligation to MCPP." Doc. 277, Pl.'s Resp. 5. Because the Court finds this was a continuing obligation, MCPP is incorrect that as a matter of law it cannot be held liable for a breach which occurred prior to the transfer of ownership.

Circling back to the ratification defense, MCPP also contends that Plaintiff cannot show any breach of the Lease by MCPP after the transfer of ownership. Doc. 199, MCPP's Br. 3. MCPP bases this proposition on the affirmative defense that Plaintiff ratified any alleged breach existing at the time the Third Amendment was signed, which took place more than a year before the transfer of ownership. *Id.* Thus, MCPP now argues—as MetLife also unsuccessfully argued—that the issues Plaintiff now complains of were ratified when Plaintiff signed the Third Amendment. *Id.* The Court, however, has already dismissed this argument in relation to MetLife. Additionally, the parties do not appear to dispute that MCPP has taken no steps towards remedying structural movement issues at

- 34 -

the leased premises since taking over the Lease in October 2015. Therefore, because MCPP cannot establish as a matter of law that Plaintiff ratified the currently alleged breach at the time the Third Amendment was signed, a fact issue exists as to whether MCPP has breached the continuing obligation to keep and maintain the structural system in good condition and repair as required under § 7(b)(ii) of the Lease, and summary judgment is **DENIED** on this point.

> ii.    *Express warranty of quiet enjoyment*

Turning to the claim for breach of the warranty of quiet enjoyment, MCPP argues that Plaintiff's claim fails as a matter of law because Plaintiff has not abandoned or been permanently deprived of the use or enjoyment of the premises. Doc. 199, MCPP's Br. 11. MCPP contends Plaintiff cannot establish the elements of the claim because "Sambuca continues to enjoy the ability to operate a restaurant at the Premises." *Id.* As this Court has previously noted, however, a tenant is not always required to abandon the premises to establish a claim for breach of the warranty of quiet enjoyment, particularly when the claim is being asserted affirmatively. *See* Doc. 25, Order 30–32 (citing *Goldman v. Alkek*, 850 S.W.2d 568 (Tex. App.—Corpus Christi 1993, no writ)). MCPP appears to acknowledge this Court's and the *Goldman* court's holding, but "submits that the weight of Texas authority requires a showing of abandonment, even when a tenant is asserting an affirmative claim and not simply invoking quiet enjoyment defensively." Doc. 199, MCPP's Br. 12 n.36.

In *Goldman*, as in this case, there was an express warranty of quiet enjoyment in the lease. *Goldman*, 850 S.W.2d at 572. It provided:

> Lessor covenants and agrees that Lessee on paying the rent and other charges herein provided for and observing and keeping the covenants, conditions, and terms of this lease on Lessee's part to be kept or performed, shall lawfully and quietly hold, occupy, and enjoy the leased premises during the term of this lease *without hindrance or*

*molestation of Lessor* or any person claiming under Lessor except such portion of the leased premises, if any, as shall be taken under the power of eminent domain.

*Id.* (emphasis in original). The landlord in that case argued the tenant did not have evidence of one of the elements of a traditional claim for breach of the warranty of quiet enjoyment, specifically that tenant had not abandoned the premises. *Id.* The *Goldman* court, however, noted that the case differed from the traditional quiet enjoyment claim because the tenant was not asserting the claim defensively to avoid paying rent. *Id.* Thus, the court held "[t]he conventional application of a breach of the warranty of quiet enjoyment does not obtain here," and the tenant "was not required to prove the traditional elements of the warranty of quiet enjoyment." *Id.* Rather, "[s]ubmission of the question on breach of this lease's warranty of quiet enjoyment was proper . . . if legally and factually sufficient evidence show that [landlord] breached the express warranty of this lease by hindering [tenant] in his occupation and enjoyment of the property." *Id.*

In this case, the express warranty of quiet enjoyment provides the following:

Provided Tenant has performed all of the terms and conditions of this Lease to be performed by Tenant, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, subject to the terms and conditions of this Lease.

Lease Agreement § 23(h). Where a lease contains an express warranty of quiet enjoyment, the express clause governs and abrogates any implied warranty of quiet enjoyment. *Goldman*, 850 S.W.2d at 571 (citing *Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex. 1984)). As MCPP notes, "Sambuca's claim for breach of the warranty of quiet enjoyment in section 23(h) of the Lease is, like all of the other claims against MCPP, a breach of contract claim based on an alleged failure to repair and maintain the . . . structural system of the Restaurant Building." Doc. 199, MCPP's Br.

- 36 -

10. Here, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether MCPP has hindered Plaintiff's "occupation and enjoyment of the property" in violation of the express warranty of quiet enjoyment in the Lease. *See Goldman*, 850 S.W.2d at 572. Therefore, summary judgment on Plaintiff's claim for breach of the express warranty of quiet enjoyment is **DENIED**.

### 3.   MetLife's and CBRE's Motions for Summary Judgment on Plaintiff's Tort Claims

The Court now turns to MetLife's and CBRE's (collectively Defendants) motions for summary judgment with regard to Plaintiff's tort claims against them. Plaintiff asserts three tort causes of action against both MetLife and CBRE: (1) fraud; (2) negligent misrepresentation; and (3) civil conspiracy. Doc. 120, Pl.'s 4th Am. Compl. ¶¶ 54–76. The gist of all three claims is that, aside from MetLife breaching its contractual obligation to maintain and repair the structural system of the building as the landlord, Defendants made numerous misrepresentations over the course of several years regarding their investigation of and efforts to remedy the plumbing and foundation issues at the leased premises. *See generally id.* ¶¶ 13–40. Defendants separately moved for summary judgment on each of the three tort claims asserted against them. Docs. 194 and 195. The factual allegations against MetLife and CBRE are the same for the tort causes of action asserted against them. *Id.* ¶¶ 54–76.[12] And although they filed separate motions, MetLife and CBRE's motions for summary judgment on these claims are largely the same as well. Therefore, the Court addresses MetLife's and CBRE's motions for summary judgment together on these causes of action, starting with Plaintiff's fraud claims.

#### i.   Fraud

---

[12]In their Consolidated Statement of Facts, Defendants acknowledge that "[a]t all times, CBRE and its employees acted at the direction of, and on behalf of, MetLife." Doc. 202, Defs.' CSF 11.

The elements of a fraud claim under Texas law are: "(1) a misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury." *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

Plaintiff alleges that MetLife and CBRE engaged in fraud by making various misrepresentations over the course of several years regarding Defendants' efforts to locate the cause of and correct the structural issues at the property after first being notified of movement by Sambuca in 2009. *See generally id.* ¶¶ 13–40. The allegedly false representations identified by Plaintiff in the Complaint fall into the following four general categories: (1) statements regarding Defendants' efforts to locate and resolve the structural issues at the property (*see id.* ¶¶ 10, 15, 19, 23, 26, 31, 55), including that a "phased investigation" was necessary to locate the cause of the movement (*see id.* ¶¶ 16, 55); (2) statements that Defendants had located the cause of the movement and that replacing the main drain line would resolve the movement-related issues (*see id.* ¶¶ 20, 55); (3) statements that the ground was expected to settle 12 to 18 months after the main drain line replacement and that additional repairs would be performed thereafter (*see id.* ¶¶ 21, 22, 23, 25, 26, 55, 57); and (4) a statement that the piers underneath the building went all the way down to bedrock (*see id.* ¶¶ 17, 55).

Defendants moved for summary judgment on the fraud claim, arguing that: (1) they did not make any actionable false statements of material fact; (2) Sambuca did not justifiably rely on the statements; (3) Sambuca's damages for fraud are barred by the consequential damages waiver in § 17

of the Lease; and (4) Sambuca ratified any alleged fraud when it signed the Third Amendment in 2014. Doc. 194, MetLife's Mot. for Summ. J ¶ 1 [hereinafter MetLife's MSJ]; Doc. 195, CBRE's Mot. for Summ. J. ¶ 1 [hereinafter CBRE's MSJ].[13] The Court turns now to Defendants' arguments.

a.      False statements of fact

Defendants argue first that Sambuca cannot show that any of the alleged misrepresentations are actionable as fraud because (1) they are statements of opinion or future intention, and (2) there is no evidence that any of the statements were false when made. Doc. 197, MetLife's Br. 3.[14]

Defendants are correct that, generally, fraud cannot arise from pure expressions of opinion or predictions about the future. *Bryant v. Transcontinental Gas Pipe Line Corp.*, 821 S.W.2d 187, 190 (Tex. App.—Houston [14th Dist.] 1991, writ denied). However, even expressions of opinion may be actionable as fraud when the parties do not have the same access to information supporting the statements. *See Roberts v. United N.M. Bank at Roswell*, 14 F.3d 1076, 1079 (5th Cir. 1994) (citing *Wright v. Carpenter*, 579 S.W.2d 575, 580 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.) ("[r]epresentations as to matters not equally open to parties are legally statements of fact and not opinions"); *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1029 (5th Cir. 1990)). And statements regarding future conduct may constitute fraud if made with no intention of actually performing in the future. *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000) (citing *Formosa Plastics*

---

[13]As with all of the claims asserted against them, Defendants also moved for summary judgment on the elements of causation and damages. However, as explained above, these issues are not addressed in this decision. For the same reasons, Defendants' arguments with regard to the economic loss doctrine are also not addressed.

[14]Defendants appear to concede that the statement regarding pier depth was a false statement of fact and argue only that Plaintiff did not justifiably rely on that statement. Doc. 197, MetLife's Br. 2 n.4; Doc. 198, CBRE's Br. 12–13.

*Corp. USA v. Presidio Eng'rs. & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). A "mere failure to perform," however, is not evidence of fraud. *Formosa*, 960 S.W.2d at 48. The party alleging fraud must present evidence that is relevant to the other party's intent at the time the representation was made. *Kimmons*, 228 F.3d at 403 (citing *Formosa*, 960 S.W.2d at 48).

Here, the Court is not convinced that the statements identified by Plaintiff are all statements of opinion or future intention as argued by Defendants. "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Transport, Inc. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). And to the extent Defendants' representations do constitute statements of opinion, Plaintiff has pointed to evidence that Defendants limited its access to information regarding the investigation of the foundation issues—including limiting Plaintiff's and its consultants' access to reports and meetings—as well as that Defendants possessed reports from 2002, 2004, 2005, and 2006 noting a history of movement-related issues at the site due to leaks, of which Plaintiff was not made aware until after it filed this lawsuit. Doc. 280, Pl.'s CSF ¶¶ 11–12, 26, 36 (citing Pl.'s App. 149–150, 480–963). Thus, even if the statements could be classified as statements of opinion, Plaintiff has provided evidence that Defendants had superior access to information on which such opinions were based.

To the extent Defendants' statements regard future conduct—such as representations that Defendants would repair all movement-related issues 12 to 18 months after the main drain line replacement—Plaintiff has provided evidence to raise a fact issue as to whether Defendants actually intended to perform in the future. For example, Plaintiff points to a series of emails exchanged between Defendants beginning in the summer of 2010 evincing Defendants' frustration with

Sambuca as a tenant and their interest in replacing it with another tenant. Pl.'s App. 1169–98. In addition to raising a fact issue as to Defendants' intent to perform in the future, this evidence also raises a fact issue as to Defendants' knowledge of the truth or falsity of each of the statements alleged by Plaintiff to be false. While Defendants point to the many tests, investigations, and repairs they performed over the years to illustrate the veracity of their statements and their intention to perform in the future, it is not this Court's place to weigh the evidence on summary judgment. *Thompson v. Syntroleum Corp.*, 108 F. App'x 900, 902 (5th Cir. 2004). And when a party's state of mind is at issue, "summary judgment is discouraged because intent is a question of fact quintessentially within the province of the factfinder." *Id.* Here, the Court concludes the summary judgment evidence raises a fact issue as to whether each alleged misrepresentation by Defendants was false when made. Therefore, summary judgment is **DENIED** on this point.

> b.    Justifiable reliance

Defendants next contend Plaintiff cannot show it justifiably relied on any of the alleged misrepresentations. Defendants first argue that "performing one's existing contractual obligations cannot constitute reliance because 'one induced to do something one already is obligated to do suffers no injury.'" Doc. 198, CBRE's Br. 7 (citing *B.M.B. Corp. v. McMahan's Valley Stores*, 869 F.2d 865, 869 (5th Cir. 1989)). Defendants also argue Plaintiff cannot support its "string along fraud" theory without evidence that it took some action beyond the scope of the contract. *Id.* at 8 (citing *Kajima Int'l Inc. v. Formosa Plastics Corp., USA.*, 15 S.W.3d 289, 293 (Tex. App.—Corpus Christi 2000, pet. denied). Plaintiff responds first by noting that "'Texas courts, and courts applying Texas law, have recognized claims for string-along or ongoing fraud to induce continued contractual

performance.'" Doc. 279, Pl.'s Resp. 8 (citing *In re Base Holdings, LLC*, No. 3:11-CV-3531-D, 2015 WL 1808536 (N.D. Tex. Apr. 21, 2015)). However, Plaintiff also contends it took additional action in reliance upon Defendants' misrepresentations beyond mere continued performance under the contract, including moving forward with remodeling plans, not moving forward with plans to identify a new location, and refraining from exercising its rights and remedies under the Lease sooner in response to Defendants' breach. *Id.* at 9.[15]

Defendants also contend that the summary judgment evidence conclusively establishes that Plaintiff did not rely on any allegedly false statements by Defendants. For this argument, Defendants point to the fact that Plaintiff hired its own consultants to investigate the cause of the foundation movement and continually expressed doubt in the steps proposed and taken by Defendants to correct the foundation issues. Doc. 198, CBRE's Br. 9–14. Defendants also pull out deposition excerpts from Plaintiff's representatives who, after the fact, indicated they did not fully trust Defendants to remedy the foundation issues and anticipated as early as October 2009 that Defendants may be maneuvering to avoid making the necessary repairs. *Id.* To the extent Plaintiff did rely on any statements, Defendants argue this reliance was not justified given the deteriorating circumstances of the relationship at the time the alleged representations were made. *Id.* at 14.

Plaintiff concedes that it "made inquiries" and "continued to ask questions" "as any tenant would do," but argues that it ultimately "continued to rely on the representations" Defendants were making at the time. Doc. 279, Pl.'s Resp. 10. Plaintiff contends it is possible to "question or have

---

[15]Throughout the briefing Plaintiff also repeatedly states that it relied on Defendants' misrepresentations in "exercising the Lease's renewal option." *See, e.g.*, Doc. 279, Pl.'s Resp. 9. However, as previously noted, Plaintiff's claim for fraudulent inducement has been dismissed. *See* Doc. 25, Order 18–21.

concern about [Defendants'] representations and still rely on them." *Id.* at 11. Put another way, "Defendants cannot lie to Sambuca and then 'when the lies are discovered, cry foul because [Sambuca] should have known better than to trust' Defendants." *Id.* (quoting *Ward Family Found. v. Arnette*, 454 B.R. 663, 687–88 (Bankr. N.D. Tex. 2011)).

"Texas courts have uniformly treated the issue of justifiable reliance as a question for the factfinder." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, Nos. H-01-3624, G-03-0481, 2010 WL 9077875, at *20 (S.D. Tex. Jan. 19, 2010). Courts "inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson*, 919 F.2d at 1026. To be sure, a "person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.'" *Lewis v. Bank of Am., NA*, 343 F.3d 540, 546 (5th Cir. 2003) (quoting *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)). However, "purported red flags are questions of fact for a jury" in the absence of "evidence making actual reliance 'extremely unlikely.'" *Orca Assets, G.P., L.L.C. v. JPMorgan Chase Bank, N.A.*, No. 05-13-01700-CV, 2015 WL 4736786, at *9 (Tex. App.—Dallas Aug. 11, 2015, pet. filed) (citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). After reviewing the summary judgment evidence, the Court concludes that—though a close call—fact issues exist with regard to whether Plaintiff justifiably relied on Defendants' alleged misrepresentations. Therefore, summary judgment is **DENIED** on this point.

> c.      Consequential damages waiver

Though confusingly briefed, Defendants also appear to argue that the consequential damages

waiver in § 17 of the Lease limits Plaintiff to actual, direct damages on its tort causes of action. Doc. 197, MetLife's Br. 11–13.[16] For its part, Plaintiff responds that "any restriction relates only to damages from MetLife's breach of the Lease and does not include damages for fraud, civil conspiracy, or negligent misrepresentation." Doc. 278, Pl.'s Resp. 17. In reply, Defendants highlight two words—"or otherwise"—placed at the end of a sentence within § 17, from which they draw the conclusion that the waiver extends to tort damages as well. Doc. 294, Defs.' Reply 12 n.38.

As reproduced in part above, § 17 provides that: "In no event shall Landlord be liable to Tenant for consequential, punitive or special damages (or any similar types of damages) by reason of a failure to perform (or a default) by Landlord hereunder or otherwise." Lease Agreement § 17. Defendants appear to place much weight on the "or otherwise" at the end of this sentence. However, as previously noted, waiver is an affirmative defense for which Defendants bear the burden of proof. *Tyson Foods, Inc.*, 2014 WL 4798443, at *3. Here, the Court cannot agree with Defendants that the inclusion of "or otherwise," as a matter of law, extends the consequential damages waiver in § 17 of the Lease to tort damages. Therefore, summary judgment is **DENIED** on this point.

d.    Third Amendment

As with the contract claims discussed above, Defendants also contend that Plaintiff ratified any alleged fraud when it signed the Third Amendment to the Lease in 2014. As previously noted, ratification occurs when a plaintiff "(1) had full knowledge of the breach of duty or wrongdoing at the time of ratification; and (2) intentionally chose to ratify the conduct in spite of this knowledge." *Optovision*, 2001 WL 1142803, at *13. As the party arguing ratification, Defendants have the burden

---

[16]The Court has already addressed the application of § 17 as it relates to Plaintiff's breach of contract claims against MetLife and MCPP.

to prove Plaintiff's knowledge of the alleged fraud and its voluntary, intentional choice to ratify the fraud in light of that knowledge. *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 461 (5th Cir. 2011). "The key question is whether [Plaintiff] had *full knowledge* of the fraudulent acts at the time of ratification." *Johnson v. Smith*, 697 S.W.2d 625, 630 (Tex. App.—Houston [14th Dist.] 1985, no writ) (emphasis in original). And if the acts of ratification are controverted, the question becomes one for the trier of fact. *Id.* at 630–31 (citing *Sawyer v. Pierce*, 580 S.W.2d 117, 123 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.)).

Defendants argue that all of the alleged misrepresentations Plaintiff complains of were made before March 31, 2014—the date Plaintiff signed the Third Amendment—and thus it is "undisputed that Sambuca was aware of the alleged fraud at the time that it entered into the Third Amendment and renewed the Lease on March 31, 2014." Doc. 198, CBRE's Br. 15. Plaintiff responds by first distinguishing the exercise of the renewal option from the signing of the Third Amendment. Doc. 279, Pl.'s Resp. 14. According to Plaintiff, the Third Amendment only memorialized the exercise of the renewal option, which Plaintiff exercised almost a year earlier, and was required by the Lease upon such exercise. *Id.* Further, as it has argued repeatedly, Plaintiff contends it did not become aware of the extent of Defendants' fraud until it received discovery in the state court lawsuit in May 2014, after which it promptly added CBRE as a party and asserted tort claims against both CBRE and MetLife in June 2014. *Id.* Because fact issues abound concerning Plaintiff's knowledge of the alleged fraud, the Court finds that Defendants have not met their burden of showing Plaintiff had "full knowledge" of the alleged fraud either at the time Plaintiff exercised its renewal option in March 2013 or when it signed the Third Amendment in March 2014. Thus, summary judgment is **DENIED**

on Defendants' ratification defense.

   *ii.*  *Negligent misrepresentation*

   The Court now turns to Plaintiff's claims for negligent misrepresentation and Defendants'

motions for summary judgment thereon. A claim for negligent misrepresentation consists of the

following elements: (1) the defendant made a representation in the course of his business, or in a

transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the

guidance of others in their business; (3) the defendant did not exercise reasonable care or

competence in obtaining or communicating information; and (4) the plaintiff suffered pecuniary loss

by justifiably relying on the representation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439,

442 (Tex. 1991). The factual allegations and evidence supporting Plaintiff's negligent

misrepresentation claims against CBRE and MetLife are the same as those underlying its fraud claims

against them. *See* Doc. 120, Pl.'s 4th Am. Compl. ¶¶ 63–70. Accordingly, Defendants argue that

"Sambuca's negligent misrepresentation claim fails for the same reasons Sambuca's fraud claim does."

Doc. 197, MetLife's Br. 10.

   With the exception of two additional arguments discussed below, Defendants raise the same

summary judgment points with regard to the negligent misrepresentation claim as they did for the

fraud claim: (1) that Defendants did not make any actionable false statements of present fact; (2)

that Plaintiff did not actually or justifiably rely on any alleged false statements; (3) that Plaintiff has

suffered no legally recoverable damages that are not barred by the consequential damages waiver in

§ 17 of the Lease; (4) that Sambuca ratified any alleged misrepresentations when it signed the Third

Amendment; and (5) that all alleged misrepresentations are barred by the applicable statute of

limitations. Doc. 194, MetLife's MSJ ¶ 2. As for the justifiable reliance, consequential damages waiver, and ratification arguments, the Court **DENIES** summary judgment for the same reasons as set forth above with regard to the fraud claim. The other two aspects of Defendants' motions, however, require further discussion.

Defendants contend Plaintiff's negligent misrepresentation claim is subject to a two-year statute of limitations and that none of the alleged misrepresentations occurring in the two-years prior to Plaintiff's filing suit are actionable misrepresentations. Doc. 198, CBRE's Br. 19–21. Within this argument are two separate issues: (1) whether Plaintiff's claim is time-barred, and (2) whether the alleged misrepresentations are actionable.

a.      Statute of Limitations

Looking first at the statute of limitations issue, Defendants are correct that a two-year statute of limitations applies to negligent misrepresentation claims in Texas. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 386 (5th Cir. 2007). Therefore, Defendants contend, because Plaintiff filed suit against MetLife on October 7, 2013, and against CBRE on June 13, 2014, any misrepresentations by MetLife before October 7, 2011, and by CBRE before June 13, 2012, are time-barred. Doc. 198, CBRE's Br. 19–21; Doc. 197, MetLife's Br. 10–11. Plaintiff, however, asserts that "both the discovery rule and fraudulent concealment would toll the statute of limitations." Doc. 279, Pl.'s Resp. 17.

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense, which includes negating the discovery rule if it applies and has been raised. *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). The determination of whether the discovery rule applies is an issue of law for the Court

- 47 -

to decide. *TIG Inc. Co. v. Aon Re, Inc.*, No. Civ.A3:041307-B, 2005 WL 3742818, at *8 (N.D. Tex. Nov. 7, 2005). Generally, application of the discovery rule requires (1) that the nature of the injury incurred is inherently undiscoverable, and (2) that the evidence of injury is objectively verifiable. *Heller Healthcare Fin., Inc. v. Boyes*, No. Civ.A. 300CV1335D, 2002 WL 1558340, at *4 (N.D. Tex. July 15, 2002).

Plaintiff contends the first element is met because it "did not know about the extent of [Defendants'] misrepresentations until receiving documents in response to discovery in this case in early 2014." Doc. 279, Pl.'s Resp. 18. Plaintiff argues it was not until then that it "learned for the first time that the 'phased investigation' was a sham to prolong and intensify Sambuca's struggle, that CBRE and MetLife did not know—and had never known—the cause of the structural movement, that CBRE and MetLife knew that the main drain line replacement would not address the structural movement, and that MetLife knew that the piers underneath the restaurant did not go to bedrock." *Id.*

Apparently conceding the first element, in their Reply, Defendants argue only that Plaintiff completely "ignores the requirement that the injury be capable of objective verification." Doc. 294, Defs.' Reply 24. Regarding this second element—that the injury be capable of objective verification—the Supreme Court of Texas has recognized that "the bar of limitations cannot be lowered for no other reason than a swearing match between parties over facts and between experts over opinions." *Heller*, 2002 WL 1558340, at *5 (citing *S.V. v. R.V.*, 933 S.W.2d 1, 15 (Tex. 1996)). "An injury is 'objectively verifiable' if the presence of an injury and the producing wrongful act cannot be disputed." *Id.* (citing *Howard v. Fiesta Tex. Show Park, Inc.*, 980 S.W.2d 716, 720 (Tex.

App.—San Antonio 1998, pet. denied)). To meet this standard, "the evidence must rise to a higher level of certainty" than the preponderance of the evidence for liability. *Prieto v. John Hancock Mut. Life Ins. Co.*, 132 F. Supp. 2d 506, 514 (N.D. Tex. 2001) (citing *S.V.*, 933 S.W.2d at 19). The summary judgment record in this case clearly reveals fact issues regarding the truth or falsity of the alleged misrepresentations and Defendants' knowledge thereof, as well as a divergence of opinion regarding Plaintiff's injury, if any, and Defendants' causation thereof, which will likely require resolution of expert issues. Thus, the Court finds that, even if the alleged misrepresentations were "inherently undiscoverable," the discovery rule would still not be available to toll the statute of limitations as a matter of law because Plaintiff's injury is not "objectively verifiable."

Plaintiff also raises the doctrine of fraudulent concealment, which tolls the statute of limitations until Plaintiff, using reasonable diligence, discovered or should have discovered the injury. *KPMG*, 988 S.W.2d at 750. Plaintiff contends that: Defendants made misrepresentations; Defendants had actual knowledge that the statements were misrepresentations; Defendants had a fixed purpose to conceal their prior misrepresentations by making additional misrepresentations; and Plaintiff reasonably relied on these misrepresentations. Doc. 279, Pl.'s Resp. 19.

"The elements of fraudulent concealment are: (1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendants use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception." *Vial v. Gas Solutions, Ltd.*, 187 S.W.3d 220, 229 (Tex. App.—Texarkana 2006, no pet.). Fraudulent concealment is an equitable doctrine and is fact-specific. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 327 (Tex. 2011). Because Plaintiff will bear the burden of proving fraudulent concealment at trial, it must at the summary judgment stage raise

a genuine issue of material fact regarding this basis for tolling. *Heller*, 2002 WL 1558340, at *5.

For their part, Defendants reply that "the doctrine of fraudulent concealment is inapplicable because Defendants did not owe any duty of disclosure to Sambuca," and that even if applicable Plaintiff had "actual knowledge" of the alleged misrepresentations when each representation was made to Plaintiff. Doc. 294, Defs.' Reply 24–25. However, "a defendant may conceal facts either by 'active misrepresentation' or 'passive silence,'" and "affirmative misrepresentations can support a fraudulent concealment defense . . . even in the absence of a duty to disclose." *Klein v. O'Neal, Inc.*, No. 7:03-CV-102-D, 2008 WL 2152030, at *3 (N.D. Tex. May 22, 2008) (quoting *Santanna Nat. Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 890, 891 (Tex. App.—Austin 1997, pet. denied)). Therefore, for the same reasons the Court finds that fact issues exist with regard to Plaintiff's underlying tort claims, it also finds that fact issues exist with regard to whether Defendants used additional misrepresentations to cover up earlier alleged misrepresentations. Thus, summary judgment on Defendants' statute of limitations defense **DENIED**.

        b.      False statements of present fact

Defendants also argue that certain statements underlying Plaintiff's claim for negligent misrepresentation are not actionable as negligent misrepresentation because they are not false statements of present fact. Doc. 198, CBRE's Br. 19–21. Defendants allege that—with the exception of the statement regarding pier depth, which was made more than two years prior to Plaintiff's filing suit—all other alleged misrepresentations "concern future conduct and therefore are not actionable as negligent misrepresentation." *Id.* at 20. Defendants are correct that a claim for negligent misrepresentation differs from a fraud claim in that negligent misrepresentation cannot be based

upon a promise of future conduct. *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996) ("A claim for negligent misrepresentation under Texas law contemplates that the 'false information' provided by the defendant is a misstatement of *existing* fact.") (emphasis in original); *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1360 (S.D. Tex. 1994) ("Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event."); *Fields v. JP Morgan Chase Bank*, No. 4:14-CV-012-A, 2014 WL 5472449, at *7 (N.D. Tex. Oct. 29, 2014) ("A negligent misrepresentation claim must be based on past or present facts, not future events, opinions, or predictions."). However, the Court having found that Plaintiff has raised a fact issue with regard to the application of the doctrine of fraudulent concealment thus allowing the statement about pier depth to factor into the calculus—which Defendants acknowledge is a statement regarding present fact—this statement alone is sufficient to preclude summary judgment on the negligent misrepresentation claim. Therefore, summary judgment is **DENIED** on Plaintiff's claim for negligent misrepresentation.

> iii.   *Civil conspiracy*

Plaintiff's last tort claim against MetLife and CBRE is for civil conspiracy. Doc. 120, 4th Am. Compl. ¶¶ 71–76. Plaintiff alleges Defendants "had a meeting of the minds to make false and deceptive representations to Sambuca" with the "true objective of driving Sambuca out of the Leased Premises." *Id.* ¶ 74. According to Plaintiff, "[t]he pattern of correspondence between MetLife . . . and CBRE . . . in or around 2010 and 2011 makes abundantly clear that MetLife and CBRE had reached a meeting of the minds to force Sambuca out of the Leased Premises." *Id.* ¶ 34

Under Texas law, civil conspiracy is "generally defined as a combination of two or more

persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Thus, the elements or civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result" *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). A defendant's liability for civil conspiracy "is derivative of an underlying tort; without independent tortious conduct, there is no actionable civil conspiracy claim." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 709–10 (5th Cir. 2009) (citing *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 381 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). In Texas, because conspiracy requires specific intent, one cannot agree or conspire to be negligent. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996). Therefore, Plaintiff's claim for conspiracy could be derivative only of its underlying claim for fraud, not negligent misrepresentation.

In their motions for summary judgment, Defendants argue Plaintiff's civil conspiracy claim fails because: (1) the underlying fraud claim fails; (2) Plaintiff has no evidence that Defendants entered into an unlawful agreement; (3) Sambuca has no legally recoverable damages that are not barred by the consequential damages waiver; and (4) Sambuca's claim is barred by the statute of limitations. Doc. 195, CBRE's MSJ ¶ 3; Doc. 194, MetLife's MSJ ¶ 3.

First, as the Court has denied Defendants' motions for summary judgment on the underlying fraud claim, the first ground for summary judgment on the conspiracy claim is moot. Second, regarding the consequential damages waiver, Defendants' motions are **DENIED** for the same reasons they were denied with regard to Plaintiff's other tort claims. Third, Defendants' statute of limitations

argument is likewise **DENIED** for the same reasons it was denied with regard to the negligent misrepresentation claim above.

As to Defendants' argument that Plaintiff has no evidence of an unlawful agreement, the Court finds that fact issues exist precluding summary judgment. Defendants contend that Plaintiff has no evidence that "MetLife and CBRE entered into an agreement 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" Doc. 198, CBRE's Br. 23 (citing *Tifford*, 562 F.3d at 709). Defendants argue that "[a]t most, Sambuca has alleged that MetLife and CBRE conspired to replace Sambuca with a different tenant, which is not an unlawful purpose" and that Sambuca has not pointed "to any evidence that MetLife and CBRE intended to accomplish this perfectly lawful goal using any unlawful means." *Id.* However, as Plaintiff notes, "[t]ypically a conspiracy is proven by circumstantial evidence." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 812 (S.D. Tex. 2009) (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968)). And such "[c]ircumstantial evidence can include acts by or statements of the alleged conspirators." *Id.* (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581–82 (Tex. 1963)).

Here, Plaintiff has pointed the Court to certain emails that raise a fact issue as to whether Defendants did in fact enter into an agreement to accomplish the purportedly lawful purpose of replacing Sambuca with a different tenant via the unlawful means of a "collaborative scheme of deceptive misrepresentations," as Plaintiff alleges. Doc. 278, Pl.'s Resp. 15. By way of example, a June 4, 2010 email between CBRE employees states the following: "We are going to very quietly pursue Houstons and another prospect we have; we are not mentioning this to any brokers and plan to keep

this quiet for obvious reasons." Pl.'s App. 1175. Another email from a CBRE employee dated June 30, 2010, states: "I have attached further information about the Sambuca restaurant we have spoken about. Please do not share with any Dallas brokers about this potentially being available as it could compromise our efforts to get the tenant out early or even at the expiration at the end of 2013." *Id.* at 1177. A subsequent email between CBRE employees indicates they were "hoping that Kim will walk away from this space and give us a right to market." *Id.* at 1180. Additional emails contain sentiments such as "I did get a return call from Kim yesterday . . . man he is bitter towards Met Life . . . but I don't think he will walk away (yet)" (*Id.* at 1184) and "Kim is growing desperate, I met him last week . . . He's not ready to walk by any means but I bet in 6 months he will change his tune" (*Id.* at 1185). A June 15, 2011 email from a MetLife employee to a CBRE employee states "I really don't want a face-to-face since I'm not interested in renewing Sambuca." *Id.* at 1189. And finally, a June 27, 2011 email between MetLife and CBRE employees states "I am sure [Sambuca's owner] would agree to a buy out but his expectations need time to lower." *Id.* at 1193. These are just a few examples of evidence in the summary judgment record which could lead a reasonable factfinder to conclude that MetLife and CBRE's allegedly false representations were part of a conspiracy to delay making necessary repairs in hopes of driving Plaintiff out of the leased premises. Because fact issues exist, summary judgment is **DENIED** regarding Plaintiff's civil conspiracy claim.

    <u>4.</u>   <u>MetLife's and MCPP's Motions for Summary Judgment on Plaintiff's Requests for Declaratory Judgment and Equitable Relief</u>

    Finally, the Court turns to Defendants' motions for summary judgment on Plaintiff's requests for declaratory judgment and equitable relief. Plaintiff's Fourth Amended Complaint includes a

demand for specific performance, various requests for declaratory judgment, and in the alternative a request to rescind the Lease renewal. Doc. 120, Pl.'s 4th Am. Compl. ¶¶ 79–85. Plaintiff's requests for declaratory judgment and equitable relief reference both MetLife and MCPP, and both defendants moved for summary judgment on each of these requests. For the reasons explained below, summary judgment is **GRANTED** as to each request.

         *i.*       *Specific performance*

Plaintiff contends that "MetLife and MCPP have failed to repair the Leased Premises pursuant to Section 7(b)(ii) of the Lease" and that "[t]here is no adequate remedy at law for the continued breach and repudiation of the contractual obligations to repair the Leased Premises." *Id.* ¶ 81. Therefore, Plaintiff "requests the Court order MetLife and MCPP to specifically perform the repair obligations pursuant to the Lease, and repair the Leased Premises." *Id.* ¶ 82.

Defendants moved for summary judgment on Plaintiff's request for specific performance, arguing that Plaintiff has an adequate remedy at law in the form of monetary damages and that an order of specific performance, to the extent even possible based on the Lease language, would require continuous supervision of the Court to enforce. Doc. 199, MCPP's Br. 15–18. Plaintiff responds by arguing that "[j]udgment for damages alone is inadequate to compensate Sambuca because it would not allow Sambuca to realize the full potential of the Lease of unique real property for which Sambuca bargained." Doc. 277, Pl.'s Resp. 14. Along these same lines, Plaintiff contends "the simple fact that the Lease concerns real property indicates that monetary damages, while warranted, are themselves an inadequate remedy." *Id.* at 15. The Court, however, agrees with Defendants that specific performance is not warranted as a matter of law in this case.

First, specific performance is an equitable remedy that is normally available only when the complaining party cannot be fully compensated through the legal remedy of damages. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 153 (5th Cir. 2004) (citing *Guzman v. Acuna*, 653 S.W.2d 315, 318 (Tex. App.—San Antonio 1983, writ dism'd); *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 225 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.)). And "[g]enerally speaking, the measure of damages for a landlord's breach of covenant to repair or keep in repair the demised premises is the difference between the contract rental of the premises and the rental value of the premises in their unrepaired condition." *Edwards v. Ward Assocs., Inc.*, 367 S.W.2d 390, 395 (Tex. Civ. App.—Dallas 1963, writ ref'd n.r.e.); *Birge v. Toppers Menswear, Inc.*, 473 S.W.2d 79, 84 (Tex. Civ. App.—Dallas 1971, writ ref'd n.r.e.). Plaintiff argues this general rule does not address the present situation, where the tenant wishes to remain in possession of the premises going forward; however, in such cases, courts have held that "where the injury to the property has not resulted in its total loss and the repair of the damaged property is economically feasible, the plaintiff may elect to recover the reasonable cost of repairs." *Samuel v. KTVU P'Ship*, No. 08-02-00010-CV, 2003 WL 22405384, at *1 (Tex. App.—El Paso Oct. 22, 2003, no pet.) (citing *Central Freight Lines, Inc. v. Naztec, Inc.*, 790 S.W.2d 733, 734 (Tex. App.—El Paso 1990, no writ)).

And though Plaintiff repeatedly argues that "[s]pecific performance is the preferred remedy to compensate for an injury related to real property because real property is unique," *see, e.g.*, doc. 277, Pl.'s Resp. 8, the typical case illustrating this principle involves the sale of real property, not a landlord's duty to repair leased property. *See, e.g.*, *Bellaire Kirkpatrick Joint Venture v. Loots*, 826 S.W.2d 205, 214 (Tex. App.—Austin 1992, writ denied) (cited by Plaintiff). Plaintiff also provides

no authority for its assertion that "the recovery of damages for past injuries does not establish an adequate remedy at law." Doc. 277, Pl.'s Resp. 14. Thus, the Court finds that Plaintiff has an adequate remedy at law for Defendants' alleged breach of the Lease Agreement in the form of the monetary damages it agreed to.

Furthermore, a "court has no power to decree specific performance in any manner except in keeping with the terms of the agreement made by the parties." *Hubler v. Oshman*, 700 S.W.2d 694, 699 (Tex. App.—Corpus Christi 1985, no writ). Here, the disagreement is over the landlord's obligation to "keep and maintain in good condition and repair: (A) the roof and structural system of the Restaurant Building . . . ." Lease Agreement § 7(b)(ii). It is beyond dispute that the parties do not agree what constitutes a structural system in "good condition and repair," or what actions would need to be taken to bring the premises up to this standard should a jury find Defendants breached this provision. This is the very basis of Plaintiff's breach of contract claims. The Lease does not prescribe specific repairs the landlord must undertake and which the Court could specifically order; rather, it outlines a continuing obligation—as discussed above—that the landlord "keep and maintain" the structural system in a certain condition, to wit, "good condition and repair."

"A court generally will not decree a party to perform a continuous series of acts which extend through a long period of time and require constant supervision by the court." *S. Plans Switching, Ltd. Co. v. BNSF Ry. Co.*, 255 S.W.3d 690, 703 (Tex. App.—Amarillo 2008, pet. denied) (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ)). Although Plaintiff argues the Court need only decree specific performance in accordance with the Lease and that it is up to Defendants to figure out the details, the Court does not find § 7(b)(ii),

requiring the landlord to "keep and maintain in good condition and repair" the structural system of the building, susceptible to an order of specific performance in this case. "It is . . . a familiar doctrine that a court of equity will not exercise its jurisdiction to grant the remedy of specific performance, however inadequate may be the remedy of damages, whenever the contract is of such a nature that the decree for specific performance cannot be enforced and its obedience compelled by the ordinary processes of the court." *Franklin Fireproofing Co. v. City of Dallas*, 29 Tex. Civ. App. 448, 451, 68 S.W. 820, 821 (1902, writ ref'd). For these reasons, summary judgment is **GRANTED** for Defendants on Plaintiff's request for specific performance.

ii.     *Declaratory judgment*

In the Fourth Amended Complaint, Plaintiff contends it "is entitled to a declaratory judgment . . . to determine the rights and obligations of the parties pursuant to the Lease." Doc. 120, 4th Am. Compl. ¶ 84. Defendants, on the other hand, in their motions for summary judgment, argue the "Court should dismiss Sambuca's declaratory judgment actions because they simply duplicate the matters raised by its breach of contract claims." Doc. 199, MCPP's Br. 19.

The Fifth Circuit has consistently interpreted the Texas Declaratory Judgments Act as a procedural statute inapplicable to declaratory judgment actions in federal court. *Flanagan v. Chesapeake Exploration, LLC*, No. 3:15-CV-0222-B, 2015 WL 6736648, at *4 n.3 (N.D. Tex. Nov. 4, 2015) (citing *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 409 (5th Cir. 2006); *Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998)). As such, federal courts apply federal procedural rules. *Id.* (citing *Rhodes v. Prince*, No. 05-CV-2343, 2006 WL 954023, at *4 (N.D. Tex. Apr. 11, 2006), *aff'd sub nom.*, *Rhodes v. City of Arlington*, 215 F. App'x 329 (5th Cir. 2007)).

Therefore, the Court must consider Plaintiff's claim for declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Id.*

The Court has broad discretion in determining whether to entertain a declaratory judgment action under the Federal Declaratory Judgment Act. *See Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991). And if a request for declaratory judgment adds nothing to an existing suit, it need not be permitted. *See Pan-Islamic Corp. v. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir. 1980).

Plaintiff requests the following declarations:

(a)    MetLife and MCPP are required to keep and maintain in good repair the structural system of the Leased Premises, which includes, but is not limited to, the slab, walls, ceilings, and floors of the Leased Premises, pursuant to its obligations under Section 7(b)(ii) of the Lease.

(b)    MetLife and MCPP are in default of the repair obligations under Section 7(b)(ii) of the Lease. MetLife and MCPP must immediately cure said default by undertaking to fix the structure.

(c)    The damages to the Leased Premises associated with structural movements are within the landlord's repair obligations under Section 7(b)(ii) of the Lease and, therefore, MetLife and MCPP are required to repair those damages. MetLife and MCPP are liable for all damages to Sambuca arising from the structural movement and MetLife and MCPP's failure to repair.

(d)    The exercise of Sambuca's renewal option does not relieve MetLife or MCPP of any of the repair obligations under the Lease, including those described herein.

Doc. 120, Pl.'s 4th Am. Compl. ¶ 84.

Defendants argue that all of the declarations Plaintiff seeks concerning Defendants' alleged breach of the repair obligations under § 7(b)(ii) will be addressed by the resolution of Plaintiff's contract claims and Defendants' affirmative defenses thereon. Doc. 199, MCPP's Br. 20–21. Therefore, according to Defendants, the declarations do no more than answer the breach of contract

questions in Sambuca's favor. *Id.* at 21. Plaintiff concedes that the contract and declaratory judgment claims "overlap" but contends that the declaratory judgment action is not duplicative of the contract claim because determining Defendants' continuing duty going forward is a different task than determining Defendants' past breach. Doc. 277, Pl.'s Resp. 21.

"[C]ourts regularly reject declaratory judgment claims that seek resolution of matters that will already be resolved as part of the claims in the lawsuit." *NorthPark Partners, LP v. Macy's Retail Holdings, Inc.*, No. 3-12-CV-4376-M, 2014 WL 462623, at *3 (N.D. Tex. Feb. 4, 2014) (citing *Regus Mgmt. Grp., LLC v. Int'l Bus. Mach. Corp.*, No. 3:07-CV-1799-B, 2008 WL 2434245, at *2 (N.D. Tex. June 17, 2008)). Here, to the extent not already mooted by the Court's grant of summary judgment on Plaintiff's request for specific performance above, the Court finds that Plaintiff's declaratory judgment claims are duplicative of and will be resolved by Plaintiff's contract causes of action. Therefore, summary judgment is **GRANTED** for Defendants on Plaintiff's requests for declaratory judgment.

   *iii.*  *Rescission*

Lastly, the Court turns to Plaintiff's request for rescission of the Lease renewal. In the Fourth Amended Complaint, Plaintiff alleges that "in the event its [sic] determined that MetLife and MCPP do not have an obligation to fully repair the Leased Premises under the renewed Lease, in the interest of equity, the Lease renewal should be rescinded to avoid the unjust enrichment of Defendants as a result of MetLife and CBRE's fraudulent inducement." Doc. 120, Pl.'s 4th Am. Compl. ¶ 85.

"Rescission is an equitable remedy that operates to extinguish a contract that is legally valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust enrichment."

*Martin v. Cadle Co.*, 133 S.W.3d 897, 903 (Tex. App.—Dallas 2004, pet. denied). Defendants moved for summary judgment on Plaintiff's request for rescission, pointing out that the fraudulent inducement claim on which the request is based was previously dismissed with prejudice by this Court. Doc. 199, MCPP's Br. 19. Defendants also argue that summary judgment is warranted because Plaintiff has retained benefits under the renewal by continuing to use and occupy the property during the renewal term. *Id.* Plaintiff responds to Defendants' second argument but fails to address this Court's dismissal of the fraudulent inducement claim on which the request for rescission is based. Therefore, summary judgment is **GRANTED** for Defendants on Plaintiff's request for rescission of the Lease renewal.

## IV.

## CONCLUSION

For the reasons explained above, MetLife's and MCPP's motions for summary judgment are **GRANTED in part** such that Plaintiff's damages for breach of the Lease Agreement are limited to actual, direct damages. Their motions are also **GRANTED** as to Plaintiff's requests for specific performance, declaratory judgment, and rescission. In all other respects, MetLife's and MCPP's motions for summary judgment are **DENIED**.

CBRE's motion for summary judgment is **DENIED** in all respects.

SO ORDERED.

SIGNED: March 15, 2017.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE